IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| CHRISTINE NORTON, on behalf of L.T. and M.T., | ) ) ) ) | No. 69302-6-I |
| Respondent, | ) ) ) | DIVISION ONE |
| v. | ) ) | |
| RUBEN TORRES, | ) ) | UNPUBLISHED OPINION |
| Appellant. | ) ) | FILED: January 21, 2014 |

SPEARMAN, A.C.J. — Ruben Torres appeals the entry of a sexual assault protection order against him based on insufficiency of the evidence. Concluding the evidence is sufficient to support entry of the order, we affirm. We also deny the respondents' request for attorney fees and costs pursuant to RAP 18.9.

## FACTS

Mr. Torres is the paternal grandfather of L.T. and M.T., who are thirteen-year-old identical twin sisters. The twins live with their mother, Christine Norton, and their stepfather, Nicholas Norton. They have visitation with their biological father pursuant to a parenting plan. The girls regularly spend time with their extended family, including their paternal grandparents, during visits with their father.

In January 2012, L.T. and M.T. complained to their mother that they no longer wished to visit their father. Ms. Norton told the girls that she had to follow

the parenting plan. When the girls became angry, Ms. Norton suggested that they write letters to their father explaining why they wanted to stop visitation. VRP at 68. The letters stated, in part:

> M.T.'s letter: Ruben is being very inappropriate and I really don't like it! If I went to the police, he could go to jail. I want him to stop. So the only way it would, would [sic] be to leave and not come on visits. I also have said I don't want to come and say my feelings but no one ever listens to what I say...Tela, Ruben, and Jessica can be rude and I explain what happens they get mad and say stop flapping and that's hurtful to me.

> L. T.'s letter: Ruben is being very inappropriate with me and I feel <u>VERY</u> uncomfortable with him.

Clerk's Papers (CP) at 10-11.

After reading her daughters' letters, Ms. Norton became concerned. She spoke with the girls, who told her they were uncomfortable about Mr. Torres touching them "on their chest, their butt." Verbatim Report of Proceedings (VRP) at 70. Ms. Norton asked her daughters if they had previously told anyone about the touching. She testified:

> And I actually asked the girls have they told anyone about the incident, and they said yes. And I've always told them that if anything ever happens, if they're in trouble or anything like that, they need to at least tell two people. And they told two people that they thought they trusted, their grandmother and their father. They didn't tell me. And I asked them why they didn't tell me either and they said well, you told us to tell two people we trusted and we thought that, you know, that it was, those two people would help us, would do something about it. And they, one said it was an accident and just blew it off, and the other one laughed at them, so.

VRP at 71-72. Ms. Norton also called the girls' father. She testified that he did not believe his daughters' allegations: "he laughed at me, called me crazy. . . ." VRP at 71. Ms. Norton reported the allegations to the police who initiated a criminal

2

investigation. She also filed a petition in King County Superior Court asking the court to enter a sexual assault protection order in favor of L.T. and M.T. and against Mr. Torres.

On August 21, 2012, the parties appeared, with counsel, for a hearing on the petition. It was agreed that instead of hearing testimony from L.T. and M.T., the judge would watch a DVD recording of interviews of the girls conducted during the criminal investigation by a child forensic interviewer.[1] The judge also heard testimony from Ms. Norton, Mr. Torres, and the girls' paternal grandmother, Tela Torres.

During the interview, when M.T. was asked if she knew why she was being interviewed, she responded "[b]ecause of my grandpa is being inappropriate [sic]." VRP at 21. M.T. said that her grandfather touched her inappropriately "[m]ore than one [time]," that the touching started when she was "little," and that it had occurred as recently as "a couple visits ago." VRP at 22. M.T. described her grandfather's behavior: "he would like tickle me and like get his hand down my shirt and go like that." VRP at 22. M.T. stated, "I would tell [my grandma, Tela Torres] and she would just say it was an accident." VRP at 22. The interviewer asked M.T. to describe the tickling in more detail:

> A: [M.T.]: He would like tickle me and then he would get his hand up my shirt and he would keep his hand there and I would push him away and I'd go tell someone.
> Q: [interviewer]: I want to hear all about the tickling, okay? Tell me how it would start. Tell me about this time, how it started.

---

[1] Although a transcript of the audio portion of the DVD recording seen by the trial judge is part of the record, the DVD itself is not.

> A: Like I would just be sitting on the couch and then he'd start like tickling my neck.
> Q: Uh hm.
>
> . . .
>
> A: And then he would tickle my foot. And then he'd tickle my stomach and then he'd go up my shirt. . . . He'd like just do that and then I would tell him to stop.
> Q: Uh hm.
> A: And then I'd be like what are you doing? And he was like I'm not doing anything. I was like that's the girl's spot. Then he was like, he was like I didn't even do anything.

VRP at 23-24. The interviewer then asked for more detail about where M.T.'s grandfather was tickling her; M.T. identified it as "[m]y chest." VRP at 24. She explained that when his hand was up her shirt he would, "brush [his hand] back and forth" on her chest. VRP at 24.

L.T. stated that her grandfather's touching was only over her shirt. VRP at 53-54. Other than that, L.T.'s description was similar to M.T.'s. She told the interviewer:

> Q [interviewer]: So tell me all about how he tickled up here. Tell me how he did that.
> A [L.T.]: He like tries, tickles my neck. And then he like to, goes more down. . . . He sort of goes down like to here and then like (inaudible).
> Q: And went down to your what?
> A: Boobs. . . .
> Q: Okay. And then what does he do when he gets down to your boobs?
> A: Well, and then I, I like run away. And my sister like tackles him. Well, not tackles him, but like starts to run away...And then like we go downstairs.
> Q: Okay. Okay. And where on your boobs did he do the tickling?
> A: Like right here. . . .
> Q: Okay In the middle of here?
> A: Yeah.

4

VRP at 52-53. Upon further questioning, L.T. explained what she meant when she said M.T. "tackles him," as, "[w]ell, like, so like sort of pushing him to get him like away from me." VRP at 56.

The interviewer asked the girls if Mr. Torres touched their breasts other than brushing back and forth against them in the context of tickling. M.T. responded, "sometimes he like grabbed me . . . and he says he's tickling my neck, but I can feel him pushing on my boobs and I'm like stop doing that and stuff." VRP at 34.

The twins reported that, in addition to verbally telling Mr. Torres to stop, they tried to make him stop in several ways. For example, M.T. said that when "his hand was brushing back and forth" on her bare breasts: "I would like, would take his hand and I'd take it away and then push his hand away. . . . Then I would run away. . . . Or sometimes I would just go to my room with [L.T.] and talk to her." VRP at 24-25. "And he would do it again and stuff and he would be like really mad and stuff. So when we, the last times we've been at our dad's with our grandpa and stuff. . . . [L.T.] and I would be with each other 24-7. And when he would try to get near us, we would push him away and run down into our room and lock the door. VRP 27-28. M.T. admitted, "when I'm at their house sometimes, I, I want to run away. And actually we planned [on] running away." VRP at 32.

The twins each stated that they reported the touching to their father and grandmother, but neither intervened. As M.T. put it, "my mom said if, when I was little, that if anything bad happens to you, go tell an adult. And they tell you that at

school for like a week and stuff. . . . And then so I did, but they wouldn't listen to me." VRP at 24. M.T. said that when Mr. Torres would touch her breasts, "I would tell my grandma [Tela Torres] and she would just say it was an accident. . . . And I would tell her that it was happening a lot. . . . And she would just say it was an accident." VRP at 22, 27, 58. L.T. reported, "One time my sister told my dad that our grandpa was touching us in weird spots. And then he's like just laughing like saying that she doesn't know what she's talking about." VRP at 49.

At the hearing, the girls' grandmother denied that M.T. and L.T. ever approached her to complain about the touching. Mr. Torres admitted to tickling the girls, but denied ever touching them inappropriately. He claimed that when the girls told him to stop tickling them, he did and they would "run off." VRP at 94. He also admitted that one of the twins "jumped on [his] back and tried to peel [him] off" while he was tickling the other twin. VRP at 95-96. Mr. Torres characterized all of this as a "game" and "[n]othing sexually, nothing inappropriate as they seem to believe at this point." VRP at 95.

At the conclusion of the hearing, the judge stated:

> I have during the many years on the bench seen many victims of sexual abuse, both young and older.

> I will tell you that the demeanor that they showed me in the video was convincing. The demeanor certainly changed dramatically the instant there was any suggestion that the interviewer was getting close to the topic of the touching. It was striking.

VRP at 107. The judge then found:

> I do find that the touching did occur on the breasts of both girls, perhaps during tickling, that the issue was brought up

6

and then it continued for some period of time. I don't find it unusual that the girls would have complained about it and that adults would have, I won't say made light of it, but had brushed it off as something that was of no consequence. But the court finds that it did happen, and the court will enter a sexual assault protection order.

In its written order the trial court "found by a preponderance of the evidence that the petitioner has been a victim of nonconsensual sexual conduct or nonconsensual sexual penetration by the respondent." CP at 14.

Mr. Torres appeals.

## DISCUSSION

Under chapter 7.90 RCW, the Sexual Assault Protection Order Act, a person may petition the court for an order protecting them from nonconsensual sexual conduct. RCW 7.90.010(4) defines "sexual conduct" as "any" of six categories of conduct.[2] Ms. Norton alleged that Mr. Torres had engaged in the conduct described in subsections (4)(a) and (e):

---

[2] (4) "Sexual conduct" means any of the following:

(a) Any intentional or knowing touching or fondling of the genitals, anus, or breasts, directly or indirectly, including through clothing;

(b) Any intentional or knowing display of the genitals, anus, or breasts for the purposes of arousal or sexual gratification of the respondent;

(c) Any intentional or knowing touching or fondling of the genitals, anus, or breasts, directly or indirectly, including through clothing, that the petitioner is forced to perform by another person or the respondent;

(d) Any forced display of the petitioner's genitals, anus, or breasts for the purposes of arousal or sexual gratification of the respondent or others;

(e) Any intentional or knowing touching of the clothed or unclothed body of a child under the age of thirteen, if done for the purpose of sexual gratification or arousal of the respondent or others; and

(f) Any coerced or forced touching or fondling by a child under the age of thirteen, directly or indirectly, including through clothing, of the genitals, anus, or breasts of the respondent or others.

7

(a) Any intentional or knowing touching or fondling of the genitals, anus, or breasts, directly or indirectly, including through clothing;

...

(e) Any intentional or knowing touching of the clothed or unclothed body of a child under the age of thirteen, if done for the purpose of sexual gratification or arousal of the respondent or others; . . .

RCW 7.90.010(4). In its oral ruling, the trial court found that only the conduct addressed under subsection (a) had been proved.

Mr. Torres argues that the trial court's findings do not support entry of the order because in the court's oral ruling it did not explicitly find that he intentionally and knowingly touched the breasts of M.T. and L.T. He also asserts that even if the court did make such a finding, the evidence in the record is insufficient to support it. Mr. Torres contends that, at most, the evidence shows that he may have accidentally touched the girls' breasts when he tickled them. We disagree with both arguments.

The final expression of the trial court's ruling is that set forth in its written order. State v. Collins, 112 Wn.2d 303, 308, 771 P.2d 350 (1989). We may also look to the trial court's oral ruling to supplement its written order. See e.g., Shelden v. Dep't of Licensing, 68 Wn. App. 681, 684-85, 845 P.2d 341 (1993); Peoples National Bank of Washington v. Birney's Enterprises, Inc., 54 Wn. App. 668, 669-72, 775 P.2d 466 (1989). When reviewing a challenge to the sufficiency of the evidence, we construe the evidence in the light most favorable to the prevailing party. State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

In its oral ruling the trial court found "that the touching did occur on the breasts of both girls." VRP at 107. Moreover, the statements by M.T. and L.T., which the trial court found to be credible, are more than sufficient to establish that this touching was intentional and knowing.[3] The girls stated repeatedly to the child forensic interviewer that Mr. Torres had touched their breasts on several occasions and that he would keep his hand on their breasts in spite of their efforts to push it away. Even when the girls complained directly to Mr. Torres that he was touching them inappropriately when he tickled them, he ignored their requests to stop the conduct. Construing these together, the record sufficiently supports the trial court's written order expressly finding that M.T and L.T. were the victims of "nonconsensual sexual misconduct" by Mr. Torres.[4] CP at 14.

Once it has been proven by a preponderance of the evidence that the alleged sexual misconduct has occurred, the statute mandates that the trial court issue the protection order.[5] RCW 7.90.090(1)(a). The trial court did not err when it did so in this case.

---

[3] Mr. Torres moved to strike that portion of Ms. Norton's brief in which she argued that the trial judge could confirm L.T.'s and M.T.'s verbal references to their "chest" and "boobs" by observing their simultaneous physical gestures on the DVDs. Brief of Respondent at 15. He contends the argument refers to matters outside the record because the DVDs are not part of the record on appeal. We view Ms. Norton's argument only as an observation that, in assessing the girls' credibility, the trial judge considered visible images as well as oral statements—a fact that is not disputed on appeal. Accordingly, the motion is denied.

[4] It was not disputed below that the touching was nonconsensual.

[5] RCW 7.90.090(1)(a) provides in relevant part:

If the court finds by a preponderance of the evidence that the petitioner has been a victim of nonconsensual sexual conduct or nonconsensual sexual penetration by the respondent, the court shall issue a sexual assault protection order;. . . (Emphasis added.)

9

Ms. Norton requests an award of attorney fees and costs under RAP 18.9(a). The cited rule authorizes an appellate court, on its own initiative or on motion of a party, to order a party who files a frivolous appeal to compensate the opposing party for its attorney fees and costs associated with the appeal. "An appeal is frivolous if, considering the entire record, the court is convinced that the appeal presents no debatable issues upon which reasonable minds might differ and that it is so devoid of merit that there is no possibility of reversal. And we resolve all doubts to whether an appeal is frivolous in favor of the appellant." Lutz Tile, Inc. v. Krech, 136 Wn. App. 899, 906, 151 P.3d 219 (2007) (internal citations omitted). We cannot conclude, on this record, that the appeal is so totally without merit as to be frivolous. Accordingly, we decline to award attorney fees and costs under RAP 18.9.

Affirmed.

WE CONCUR:

_____

_____, A.C.J.

_____